**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BRIAN WILLIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-3297 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| TARRY WILLIAMS, *et. al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Brian Willis is an inmate in the custody of the Illinois Department of Corrections ("IDOC") at Stateville Correctional Center ("Stateville"). For more than two years, he complained that pieces of the commissary ceiling were falling onto the floor below, where inmates congregated. He warned that this posed a serious risk of harm. [181-3, 181-5, 181-6, 181-7, Ex. F.] And although Plaintiff tried to convey his concerns to those at Stateville who might be in a position to address the problem, the ceiling was not repaired. On October 6, 2015, Willis's fears allegedly came to pass. According to Willis, a piece of wood fell from the commissary ceiling and struck him on the head, knocking him unconscious and causing a severe head injury. [179, PSOAF, ¶ 1.][1]

Plaintiff subsequently commenced this lawsuit, bringing claims under 42 U.S.C. § 1983 and Illinois law against two groups of Defendants. The first group consists of six current and former employees of IDOC who worked at Stateville in the years leading up to Plaintiff's injury (collectively, "the IDOC Defendants"), including Tarry Williams and Michael Lemke, former

---

[1] Because Plaintiff's Local Rule 56.1 responses to Defendants' respective Statements of Undisputed Fact are combined with Plaintiff's Statements of Additional Facts, acronyms are necessary to differentiate between duplicate paragraph numbers in some docket entries. PRDSOF stands for Plaintiff's Response to Defendant's Statement of Fact and PSOAF stands for Plaintiff's Statement of Additional Fact.

Wardens; Nicholas Lamb, former Assistant Warden of Operations; Troy Johnson and Jimmy Louch, former Chief Engineers; and Clarence Wright, former Correctional Lieutenant. In addition to suing all six for negligence, Plaintiff alleges that each of the IDOC Defendants was deliberately indifferent to the risk posed to inmates by Stateville's deteriorating commissary ceiling in violation of the Eighth Amendment. In addition to suing each Defendant in his individual capacity, Plaintiff also sues Defendants Williams, Lemke, and Lamb in their official capacity.

The second group of Defendants consists of Dr. Alma Martija and Dr. Saleh Obaisi—the physicians who treated Plaintiff for his injuries in the aftermath of the incident—and Wexford Health Services, Inc., their employer (collectively, "the Wexford Defendants"). Wexford is a private corporation that contracts with IDOC to provide medical care to inmates at IDOC facilities, including Stateville. [167, ¶ 2.] Plaintiff sues Dr. Martija and Dr. Obaisi under 42 U.S.C. § 1983 for allegedly acting with deliberate indifference to his medical needs. He also brings a *Monell* claim against Wexford, alleging that it maintained a policy of denying inmates necessary medical care in the interest of cutting costs.

Before the Court are two motions for summary judgment, one filed jointly by the Wexford Defendants [165] and one filed jointly by the IDOC Defendants [168]. For the reasons that follow, the Court grants the Wexford Defendants' motion in full and the IDOC Defendants' motion in part. With respect to that motion, the Court will enter summary judgment on the individual-capacity claims against Defendants Williams and Lemke. The Court denies the remainder of the IDOC motion in full. The Court further orders, with respect to Plaintiff's official capacity claims against Defendants Lemke, Williams, and Lamb, that the current Warden and Assistant Warden of Operations of Stateville be substituted under Fed. R. Civ. P. 25(d). This case is set for a

telephone status hearing on October 17, 2022, at 9:30 a.m. Participants should use the Court's toll-free, call-in number 877-336-1829, passcode 6963747.

## I.    Background

The Court draws its facts primarily from the parties' Rule 56.1 statements and responses. [167, 169, 179, 181, 186, 188.]  However, where it feels that the parties' filings leave out important contextual information, it pulls additional material from the record.  See  Fed. R. Civ. P. 56(c)(3) (noting that "courts need consider only the cited materials, but . . . may consider other materials in the record" as well).  Where facts are disputed, the Court will so note.

### A.    The Stateville Chain-of-Command

Stateville Correctional Center is one of two related facilities.  Next door to Stateville is a newer facility, Stateville NRC, which has its own independent staff.  [181-9, Louch Dep. Tr. 36:9–17]; [181-2, Lamb Dep. Tr. 37:15–20.]  To avoid confusion, all references to Stateville in this opinion refer to the older facility, where Plaintiff was incarcerated.

At all times relevant to this opinion, Stateville was run by a single Warden.  Defendant Lemke occupied this role until December 31, 2013, after which he left Stateville.  [181-10, Lemke Dep. Tr. 44:17–19.]  Defendant Williams took over the position from April of 2014 until July of 2015, before accepting the position of Chief of Operations at Cook County Jail.  [181-11, Williams Dep. Tr. 13:18–14:24.]  It is undisputed that Defendant Lemke was "responsible for overseeing the commissary and maintenance within the commissary."  [188, ¶ 7.]  Defendant Williams occupied the same position and stated in his deposition that he was "[u]ltimately . . . responsible for Stateville," including the conditions of the commissary.  [181-11, Williams Dep. Tr. 95:8–19.]

Two Assistant Wardens reported to the head Warden—an Assistant Warden of Programs ("AWP") and an Assistant Warden of Operations ("AWO").  [181-12, Johnson Dep. Tr. 24:24–

3

25:2.]  Defendant Nicholas Lamb was AWO "from 2014 through sometime in 2017."  [181-2, Lamb Dep. Tr. 14:3–4.]  As AWO, Lamb was in charge of, among other things, maintenance.  [*Id.* at 15:9–18.]  Stateville's Chief Engineer reported directly to the AWO.  [*Id.*]  In addition to overseeing the work of the Chief Engineer, the AWO was in charge of the Safety and Sanitation Department, which inspected prison facilities and recommended necessary repairs.  [181-10, Lemke Dep. Tr. 29:2–18.]  As AWO, Defendant Lamb was responsible for compiling weekly Safety and Sanitation inspections into a monthly report for the Warden.  [*Id.*]; [181-2, Lamb Dep. Tr. 57:2–9.]

While the AWO (like the Warden), was ultimately responsible for maintenance, the Chief Engineer who reported to him was the most directly responsible for seeing that necessary repairs were actually completed.  [*Id.* at 16:4–11.]  The Chief Engineer was responsible for processing "work requests[]" and "work orders[] . . . in regard to all maintenance problems."  [181-9, Louch Dep. Tr. 33:19–23.]  The Chief Engineer would "prioritize" work orders, delegate maintenance jobs to tradesmen, and "follow up on the completion" of those jobs.  [*Id.* at 20:23–21:5, 27:23–28:3, 28:24–29:14.]  According to Defendant Lamb, only "major maintenance concerns" were reported to him by the Chief Engineer.  [181-2, Lamb Dep. Tr. 16:12–20.]

Stateville NRC and Stateville each had their own Chief Engineer.  According to Defendant Johnson, he worked as Chief Engineer of Stateville for just nine months, around Fall of 2013 into the middle of 2014.  [181-12, Johnson Dep. Tr. 54:5–16.]  Even though Johnson stated in his deposition that he was "absolutely . . . not" at Stateville by January 5, 2015, [*Id.* at 53:24–54:2], the IDOC Defendants' statement of undisputed facts says that he was Chief Engineer on October 6, 2015.  [169, ¶ 14.]

Defendant Louch's employment history is more complicated and less clearly set forth by the record. Apparently, he spent time as a stationary engineer before being promoted to temporary Chief Engineer of Stateville. As stationary engineer, Louch was responsible for maintaining the "powerhouse"—which provided heat to the prison "from high-pressure boilers"—as well as Stateville's "waterworks." [*Id.* at 15:1–15.] After spending time as temporary Chief Engineer at Stateville, Louch transitioned to the role of temporary Chief Engineer of Stateville NRC. [181-9, Louch Dep. Tr. 47:13–20.] For a time, he was the only Chief Engineer at either Stateville NRC or Stateville and was consequently responsible for maintenance at both facilities. [*Id.* at 36:6–7.] He acknowledges that during this period he may have had to handle issues related to the roof or ceiling in the Stateville commissary. [*Id.* at 36:1–8.] The record is not clear on when Louch left his position as temporary Chief Engineer, but he remembers leaving "sometime in '15." [*Id.* at 34:18–21.] The parties seem to agree that he was no longer Chief Engineer on the date of the incident. Their respective statements of fact refer to him only as "an engineer . . . on the date of the incident." [169, ¶ 13]; [181, PRDSOF, ¶ 13.]

Defendant Wright was a Correctional Lieutenant. On any given day, he reported to the Shift Commander on duty, who in turn reported to the AWO. [181-13, Wright Dep. Tr. 15:6–9.] Wright was assigned to the Stateville Commissary "approximately from 2012 through 2015," including October 6, 2015. [*Id.* at 12:20–13:10]; [169, ¶ 16.] In this role, Wright would "tak[e] inmates from their housing unit" to the commissary, where he would then ensure that the commissary process unfolded smoothly. [181-13, Wright Dep. Tr. 12:20–13:10.] Wright also completed weekly Safety and Sanitation inspections of the commissary and sent work orders to the Chief Engineer for repairs. [*Id.* at 31:23–32:7, 33:10–23.] Safety and Sanitation Inspections were dropped off at the shift commander's office, who would pass them up the chain. [*Id.* at 34:3–

17]; [181-2, Lamb Dep. Tr. 57:4–22.]  Wright submitted work orders to the Chief Engineer using "a drop box outside his office . . . ."  [181-13, Wright Dep. Tr. 39:15–20.]

### B.     The Stateville Commissary

At the time of Plaintiff's alleged injury, Stateville had a single commissary, where inmates could shop for basic sundries.  Inmates interested in purchasing something from the Stateville commissary were "lin[ed] up" and "escort[ed]" there by a correctional officer, often Defendant Wright.  [*Id.* at Tr. 13:1–13:10.]  Once there, inmates would "wait" in a general "holding area" for "for their commissary . . . number to be called."  [*Id.* at 13:22–14:4.]  Inmates did not shop all at once, but rather were "called up one by one."  [*Id.*]  According to Plaintiff, a group of inmates shopping at any one time were "lock[ed] . . . in" the commissary while this process unfolded.  [181-1, Willis Dep. Tr. 130:9–11.]  They might "have to sit waiting for hours and hours under . . . [the] roof," which was allegedly falling apart.  [*Id.* at 130:9–11.]

The structure of the commissary consisted of three primary layers: (1) the roof; (2) the support beams beneath the roof; and (3) the ceiling.  It is undisputed that the ceiling itself was comprised of "extremely light weight" tiles "made of a substance similar to foam paper."  [167, ¶ 67.]  Above those tiles spanned wooden support beams, that, but for the ceiling tiles covering them, would be visible from the commissary.  See [181-2, Lamb Dep. Tr. 109:4–20]; [172, p. 31.] Finally, covering both of these layers was the roof itself.  Although there may have been more structural features between the beams and the roof, the record is silent on the matter.

There is substantial evidence, however, that the commissary roof, which sheltered the support beams and ceiling tiles from the elements, was leaky and needed to be repaired.  When Defendant Johnson, formerly Chief Engineer at Stateville, was asked at his deposition whether he recalled reviewing or receiving a work order related to the commissary roof, he responded

affirmatively, adding that "we knew the roof needed to be repaired" and that efforts had been made to secure the funds necessary to make those repairs. [181-12, Johnson Dep. Tr. 90:23–91:6.] Earlier in the deposition, he acknowledged that although "the roofs leaked for years," there wasn't enough "money to fix [them]." [*Id.* at 87:6–10.] The problem was apparently serious enough that Defendant Johnson and others "continually" "put in for projects" to fix the roofs. [*Id.* at 90:23–91:6.] Defendant Johnson's testimony is corroborated by Defendant Louch, who, without giving specifics, "recall[ed] some issues with the commissary." [181-9, Louch Dep. Tr. 44:11–16.] Defendant Wright, moreover, acknowledged that he submitted a work order "related to the commissary roof back in January of 2015." [181-13, Wright Dep. Tr. 32:15–17.]

The leaks in the commissary roof were apparently significant enough that "some of the ceiling tiles," which were separated from the roof by the commissary's support beams, would become "wet and . . . turn a funny color." [181-2, Lamb Dep. Tr. 44:2–10.] According to Defendant Lamb, some of the tiles exposed to such moisture "start[ed] deteriorating." [*Id.*] This observation was confirmed by Defendant Wright, who remembers "crack[ing] in certain places," [181-13, Wright Dep. Tr. 35:12–13], and by Safety and Sanitation inspections of the commissary, which consistently reported that the commissary ceiling was in need of repair. [181-8.] Monthly memoranda sent by Defendant Lamb to Defendant Williams concluded that the ceiling in the "[m]ain area" of the commissary "need[ed] to be replaced[]" and reported that tiles in some of the commissary's storage areas were "falling down" entirely. [181-4.] When Defendant Johnson "ask[ed] the Business Office for [replacement] ceiling tiles" during his tenure as Chief Engineer, he remembers being told that they did not "have the money" for them and that replacing them was "not a priority." [181-12, Johnson Dep. Tr. 89:21–90:3.]

From this evidence, three important conclusions can be drawn: (1) the commissary roof leaked; (2) the water that came in through the roof trickled down through the support-beam layer to the tiles, which began to deteriorate as a result; and (3) this problem was both visible and widely known.

### C. Plaintiff's Efforts to Warn Stateville Officials About the Commissary Ceiling

In the years leading up to the October 6, 2015, incident, Plaintiff attempted to warn officials at Stateville that the commissary roof and ceiling not only leaked, a fact that was already widely known, but was also falling down. In five offender requests and one emergency grievance, Plaintiff expressed concern that the commissary ceiling was hazardous and threatened to seriously harm inmates using the commissary.

#### 1. *The Offender Requests*

Plaintiff's first five attempts to warn Defendants were communicated via "Offender Requests." Those requests included the following:

- On July 21, 2013, Plaintiff sent an Offender Request to Defendant Louch, warning him that "the roof/ceiling in the commissary building is falling down and leaking rain," that "this condition has existed for over a year," and that he had "been complaining with no results." [181-3, Ex. A.]

- On October 15, 2013, Plaintiff sent an Offender Request to Defendant Lemke, warning him that "the ceiling and roof in the commissary building is falling down where inmates have to sit and wait" and that "[t]his poses a[] serious risk of injury." He recommended that either the roof "be fixed" or the commissary be "shut down." [*Id.* at Ex. B.]

- On September 10, 2014, Plaintiff sent an Offender Request to Defendant Williams, warning him not only that "[t]he roof/ceiling in the commissary building is falling down," but more specifically that "[w]ood and ceiling debris [was] falling and could seriously hurt someone." [181-6, Ex. C.]

- On October 1, 2014, Plaintiff sent an Offender Request to Defendant Johnson, warning him that "[t]he commissary building roof and ceiling is falling down and leaking where inmates are forced to sit." Consistent with his previous Offender Request, Plaintiff once again expressed concern that "wood and debris [was] falling," a state of affairs he characterized as "unsafe." [*Id.* at Ex. D.]

- On January 16, 2015, Plaintiff sent an Offender Request to Defendant Wright, warning that "[t]he roof and ceiling [was] falling down in the commissary building." He requested that either the "hazard" be fixed or "the commissary [moved] to [their] living unit." He complained that it had "been at least 2½ years" since the ceiling began "falling down." [181-7, Ex. F.]

The record has little to say about how offender requests were processed. When asked, many of the IDOC Defendants were either not familiar with this type of form at all or claimed to have little experience with them. [181-13, Wright Dep. Tr. 30:5–16]; [181-12, Johnson Dep. Tr. 44:13–45:7]; [181-9, Louch Dep. Tr. 17:2–10.] Wardens Lemke and Williams were most familiar. [181-10, Lemke Dep. Tr. 18:11–23]; [181-11, Williams Dep. Tr. 74–76.] In their Rule 56.1 filings and summary judgment briefs, the IDOC Defendants collectively dispute that they received or read these offender requests. [188, ¶¶ 6, 8, 11, 16, 20.]

2. *The Emergency Grievance*

On August 19, 2015, Plaintiff lodged an emergency grievance, which is reproduced below.

In the commissary room there is a hazard in the ceilings. The ceilings are leaking everytime [sic] it rains and the ceilings are falling in with insides of the ceilings exposed, showing *rotten and falling wood*. This is an area where all Inmates who go to the commissary building are exposed to, and are at risk of our safety, because we are forced to sit and wait for long periods of time up under this falling ceiling. This ceiling has been falling down for several years with inmates being injured and complaining about this hazardous ceiling/roof. Nothing has been done to prevent the risk of harm which the entire staff at Stateville C.C. knows about. Instead of taking measures to prevent the risk of injury or harm, the staff makes jokes about it, and taunts us. [181-5] (emphasis added).

The record sheds more light on Stateville's procedure for processing grievances than it does on its procedure for processing offender requests. Grievances are divided into two categories, emergency and non-emergency. [181-2, Lamb Dep. Tr. 30:13–31:2.] Non-emergency grievances are processed in the first instance by a grievance counselor. [*Id.*] Emergency grievances, by contrast, are sent "straight to the warden or the warden's designee" for review. [*Id.* at 30:13–15.]

9

Because Defendant Lamb was the Warden's designee during his tenure as AWO, he had the authority to determine for himself whether an ostensible emergency actually qualified as one. [*Id.* at 31:16–21, 52:4–7.] If he determined that an emergency grievance, in fact, concerned a non-emergency, he would "kick it back down to the counselor to rectify it." [*Id.* at 32:4–7.]

Plaintiff's grievance appears to have been processed in this manner. Plaintiff's grievance was deemed a non-emergency on August 31, 2015, and signed in Defendant Lamb's name. [181-5.] The grievance was then forwarded on to a grievance counselor, who responded, on September 18, 2015, that "the leak is a result of the rain" and that "measures are taken to ensure the safety and security of staff and offenders." [*Id.*]

Defendant Lamb claims that the signature on Plaintiff's grievance is not his. [181-2, Lamb Dep. Tr. 34:15–24, 40:11–19.] He does not claim his signature was forged—rather, he does not "recognize the handwriting" and figures that it must have been signed on his behalf. [*Id.*] Although Lamb does not remember anyone in his office having the authority to sign emergency grievances on his behalf, he speculates that the document was signed by Ricardo Tejada or Walter Nicholson, both of whom were Assistant Wardens when Lamb apparently filled in as Warden on a temporary basis. [*Id.* at 35:13–19, 37:3–24, 38:18–39:1.]

### 3. *Plaintiff's Conversations with Lieutenant Wright*

Plaintiff claims to have followed up on the offender request he sent to Defendant Wright in person. According to Plaintiff, he approached Defendant Wright after sending the request and asked him what he thought about the concerns expressed in it. [181-1, Willis Dep. Tr. 120–122.] Defendant Wright allegedly responded that he was "already aware of the problem because he had been working in the commissary for a long time" and that "they," presumably a reference to prison officials with the authority to allocate funds and authorize repairs, "don't want . . . to spend . . .

money." [*Id.*] Perhaps in an effort to manage Plaintiff's expectations, he emphasized that his complaints were not "important right now due to the budget . . . ." [*Id.*]

When asked whether Defendant Wright acknowledged during this conversation that he had actually received Plaintiff's offender request, Plaintiff responded that Defendant Wright "said, yeah, I'm aware of it," and that he took this to mean that he had received and was aware of Plaintiff's letter. [*Id.*] At his deposition, Defendant Wright acknowledged that he had spoken to Plaintiff before, "[d]uring the chow line," in "the commissary line," and in the "yard." [181-13, Wright Dep. Tr. 72:1–14.] He did not remember, however, Plaintiff speaking with him about his complaints regarding the commissary ceiling. [*Id.* at 72:15–18.]

### D.   October 6, 2015, Incident and the IDOC Investigation

On October 6, 2015, after allegedly spending more than two years trying to warn Stateville officials about the commissary ceiling, Plaintiff claims that "a portion or portions of the commissary's ceiling fell onto his head." [58, ¶ 21.] Although Plaintiff is not always clear about what exactly struck him on the head, the briefs he filed in opposition to both the IDOC Defendants' and the Wexford Defendants' motions for summary judgment specifically state that it was a piece of "wood" that fell from the commissary ceiling. [178, p. 1]; [180, p.1.] This is consistent with a photograph taken by IDOC investigators at the scene of the accident, which shows Plaintiff lying on the commissary floor next to a large piece of wood. [172, p. 30.] The blow was allegedly so severe that it knocked Plaintiff unconscious. [179, PSOAF, ¶ 1.] He remembers waking "up to the aid of medical staff," who put "a neck brace . . . around his neck" and "transported [him] to Stateville's hospital." [*Id.* at ¶¶ 2–3.]

The same day, IDOC investigator James Sullivan asked Plaintiff questions about the accident. Plaintiff gave a signed statement that he was "sitting in a chair waiting to be called for

11

his commissary" when "a piece of wood" fell from the commissary ceiling and "hit him on the right side of his head." [172, p. 9.] He claimed to have been "in such pain that he rolled off the chair and layed [sic] on the floor." [*Id.*] After conducting this initial interview, Sullivan reached out to six other inmates at Stateville. Many of them had not seen the incident. However, one of them claimed that another inmate "climbed up and knocked the wood down onto the ground" and "sprinkled some busted up wood chips on" Plaintiff's head. [*Id.* at p. 11.] Moreover, Plaintiff's cell mate, who did not see the incident himself, expressed his view that "there [was] no way that" the wood "fell on its own" and that "some one [sic] had to have climbed up the windows and pulled down the ceiling." [*Id.* at p. 13.] More importantly, he allegedly claimed that Plaintiff "ha[d] been talking for 2 weeks about how he was going to make money by acting like he was hurt by some falling ceiling in the commissary." [*Id.*] In addition to the damaging information in these two interviews, Sullivan also claims to have received an anonymous letter explaining that Plaintiff had bragged that he was going to "get 10,000 in a law suit." [*Id.* at p. 22.] The letter further claimed that another inmate "was nocking [sic] that stuff down," presumably a reference to the wood that Plaintiff claims struck him. [*Id.* at p. 22.]

On October 7, 2015, Sullivan interviewed Plaintiff a second time. At that interview—which Plaintiff claims was conducted while he was under medical observation in the infirmary—Plaintiff allegedly recanted his earlier statement. Sullivan claims that Plaintiff told him that "the first statement he had given wasn't entirely true" and that "wood never had fallen on his head in the commissary bull pen" and that "he's leaving it at that." [*Id.* at 24.] Plaintiff signed that apparent recantation. [*Id.*] On August 23, 2019, Sullivan, who is now a detective with the Joliet Police Department, signed a declaration swearing that "the statements and expressions of both [himself] and others" contained in the IDOC investigative report [172] "were made according to

the information . . . available to [him] at the times stated therein" and that Plaintiff's recantation took place as the report describes. [167-7, ¶¶ 2–3.]

While Plaintiff acknowledges signing the statement, he claims that he never recanted his earlier statement to Sullivan and that his signature was coerced. [181-2, Willis Dep. Tr. 56:1–5.] According to him, Sullivan "threatened to remove [him] from the infirmary" and "put [him] into . . . solitary confinement" if he did not sign the statement, which would have prevented him from "getting medical treatment" for his injuries. [*Id.* at 57:8–17.] He further claims that Sullivan told him that Stateville did not "have the money . . . to be in litigation." [*Id.* at 57:23–58:2.]

### E. **Plaintiff's Medical Treatment**

#### 1. *Dr. Martija*

In the immediate aftermath of the October 6, 2015, incident, Plaintiff was taken to the Stateville infirmary, where Defendant Martija conducted an initial evaluation of his condition. [167, ¶ 21.] Dr. Martija determined that Plaintiff suffered from "a head injury" and conducted a gross neurological examination to determine whether anything was wrong with him that might justify a more thorough examination. [179-1, Martija Dep. Tr. 40:3, 48:20–49:1.] At her deposition, Dr. Martija explained that a gross neurological examination is a "quick visual," that looks for a variety of symptoms that might signify severe neurological damage, including (1) "muscle weakness," (2) "abnormal movement," (3) "isochoric and reactive" pupils, (4) neck "asymmetry," (5) "meningeal signs," (6) impaired "[m]ental status," and (7) impaired "[s]peech." [*Id.* at 47–48.]

A gross neurological examination is not the most thorough method of assessing a potential neurological injury. According to Dr. Martija, a more "detailed neurologic exam" would include more rigorous methods of assessing mental status, a systematic "itemiz[ation]" of "the 12 cranial

nerves," a "sensory exam," "cerebellar testing," and "a few other things." [*Id.* at 48:5–19.] According to her, however, if a patient's gross neurological examination is normal, a more detailed examination will "most likely . . . be normal" as well. [*Id.* at 48:20–24.]

According to Dr. Martija, the results of Plaintiff's gross neurological exam were normal. [167, ¶ 21.] Plaintiff contests this finding on the grounds that he was suffering from a contusion, hematoma and headache. [179, PRDSOF, ¶ 21.] But Plaintiff points to no evidence in the record that any of these symptoms are inconsistent with a normal gross neurological examination. According to Dr. Martija, the symptoms that a gross neurological examination looks for do not include contusion, hematoma, or headache. [179-1, Martija Dep. Tr. 47:13–48:4.] In any case, Plaintiff apparently does not dispute that it was Dr. Martija's "professional opinion" that "a gross neurological examination was appropriate to assess Plaintiff at this time." [*Id.*][2]

After completing her initial evaluation, Dr. Martija decided to admit Plaintiff to the infirmary for 23-hour observation to determine if he needed to be sent out for further evaluation. [179, PRDSOF, ¶ 24.] Although she apparently understood that outside referral might become necessary, she thought that it was "too soon to make that determination." [179-1, Martija Dep. Tr. 45:18–46:5.] During that time, Dr. Martija ordered that "neuro checks be performed every four hours" and that ice be placed on his contusion for 20 minutes, three times a day. [179, PRDSOF, ¶ 24.] She also prescribed Visatril for nausea and Tylenol for pain. [*Id.*] During this time, "Plaintiff's condition did not decompensate" and Dr. Martija concluded, based on an evaluation of Plaintiff's symptoms, that he did not "require[] an urgent or emergent referral to an outside

---

[2] Plaintiff is silent on this point in his response to Defendant's Statement of Material Facts. See [179, PRDSOF, ¶ 21.] His objection is limited to challenging Defendants' assertion that the "results" of the gross neurological examination "were normal." [*Id.*] He does not cite to any evidence that might suggest, even impliedly, that Dr. Martija did not subjectively understand a gross neurological examination to be appropriate under the circumstances.

physician." [*Id.* at ¶¶ 25–26.] Plaintiff disputes that Dr. Martija's evaluation at this time was appropriate to make this determination and argues that his "condition required additional evaluation." [*Id.*]

Plaintiff was discharged from the infirmary on October 7, 2015. At that time, Dr. Martija conducted a "follow-up medical evaluation," and "noted that Plaintiff's 23 hours of observation were uneventful" and that Plaintiff showed "no malignant signs of serious neurological damage . . . ." [*Id.* at ¶ 28.] She concluded that he could manage his symptoms "on his own," and recommended that he rest and take Tylenol for pain. [*Id.*] Plaintiff contests Defendants' assertion that his mental status did not deteriorate during his 23-hour observation. He points to the fact that he allegedly "threw up and experienced multiple headaches that lasted multiple hours." [*Id.* at ¶ 28.] According to Dr. Martija's deposition testimony, however, "vomiting and headache" are not symptoms physicians "look for" to determine whether a patient is suffering from "serious neurological damage." [179-1, Martija Dep. Tr. 60:10–61:19.] Rather, the "deteriorat[ion]" that would occur in the event of a serious brain injury is deterioration with respect to "upper cognitive functions," like "memory[] and speech." [*Id.*]

On October 8, 2015, Plaintiff sent Dr. Martija a medical service request complaining of "severe headaches, memory loss, blurred and double vision, re-occurring light headedness, dizziness," an inability to "concentrate[] or sleep, slow verbal and physical responses, [and] extreme neck and back pain." [179-2, p. 1.] He requested "to be seen by a qualified specialist (neurologist) to determine what possible brain damage or nerve damage occurred so [he could] get some treatment." [*Id.*] As Plaintiff concedes, such requests for care were "never provided to the physician." [179, PRDSOF, ¶ 13.] Plaintiff would not send another medical service request to Dr. Martija until February 19, 2016.

15

Dr. Martija treated Plaintiff just one more time, on October 16, 2015. At that appointment, Plaintiff complained of lingering eye pain, headaches, double vision, and trouble with memory. [*Id.* at ¶ 31]; [186, ¶ 5.] He asked to see a neurologist for an MRI and CT scan. [179, PRDSOF, ¶ 31.] Dr. Martija did not herself have the authority to refer Plaintiff to an outside physician, but she could refer patients to Dr. Obaisi, who did have that authority. [186, ¶ 6.] Nonetheless, after conducting another gross neurological examination, Dr. Martija concluded that Plaintiff's condition had "improved" and, accordingly, that he did not require urgent or emergent care. [179, PRDSOF, ¶ 31.] Plaintiff disputes that his condition had improved but provides no evidence to support this assertion.

Plaintiff did not see Dr. Martija again after this appointment, although he did send medical service requests to her on February 19, 2016; March 23, 2016; April 18, 2016; May 22, 2016; and August 20, 2016. Again, Plaintiff does not dispute that Dr. Martija would not have seen any of these requests. [179, PRDSOF, ¶ 13.]

## 2. *Dr. Obaisi*

Plaintiff's next appointment was with Dr. Obaisi, Medical Director of Stateville. Plaintiff would see Dr. Obaisi a total of five times, although there is very little information about these appointments in the record.

Plaintiff's first appointment with Dr. Obaisi took place on November 15, 2015. [*Id.* at ¶ 33.] At that appointment, Plaintiff "complained of 'occasional headache' and" told Dr. Obaisi that "taking Motrin provided him with a 'good result.'" [*Id.*]

On January 20, 2016, "Dr. Obaisi performed a follow up evaluation on Plaintiff in connection with his alleged headaches." [*Id.* at ¶ 34.] Plaintiff "complained of pounding in the

temporal area with blurred vision" as well as "back pain." [*Id.*] Dr. Obaisi renewed Plaintiff's prescriptions and "noted that . . . there [were] no acute findings." [*Id.*]

On February 17, 2016, Plaintiff had his third appointment with Dr. Obaisi. At that appointment, Plaintiff "complained of migraine headaches" as well as "lower back pain." [*Id.* at ¶ 35.] Dr. Obaisi evaluated Plaintiff, renewed his medication, and, once again, "noted that there were no acute findings." [*Id.*]

Plaintiff's fourth appointment with Dr. Obaisi took place on August 17, 2016. At that appointment, Plaintiff complained that he continued to suffer from headache, nausea, vomiting, blurred vision, and sluggish memory. [*Id.* at ¶ 36.] Dr. Obaisi conducted another examination, which found that Plaintiff was "neurologically intact." [*Id.*] Nevertheless, he ordered Plaintiff to discontinue one of his medications and "referred Plaintiff for a CT scan of his head and neck." [*Id.*]

At some point before this appointment, Plaintiff claims that Dr. Obaisi told him that he was instructed by his bosses directly that Wexford was trying to save money at the expense of inmate care and that he could not grant Plaintiff's requests for a neurological referral as a result. [*Id.* at PSOAF, ¶ 4.] Plaintiff cannot remember exactly when Dr. Obaisi told him this but recalls that it was after he sustained his head injury. [179-5, Willis Dep. Tr. 25:4–15.] Defendants dispute that Dr. Obaisi ever said this.

In any case, the CT scan referral Dr. Obaisi put in after Plaintiff's fourth appointment was approved by Wexford's collegial board on August 23, 2016. [179, PRDSOF, ¶ 37.] On November 2, 2016, "a CT scan of Plaintiff's head and neck was performed at St. Joseph's hospital." [*Id.* at ¶ 38.] It found nothing out of the ordinary. [*Id.*] On November 15, 2016, Dr. Obaisi explained

Plaintiff's test results to him. [*Id.* at ¶ 39.] This was Plaintiff's fifth and final appointment with Dr. Obaisi.

Although Plaintiff's Second Amended Complaint asserts that his condition deteriorated while he was under Dr. Obaisi's care, Plaintiff's Local Rule 56.1 filings and summary judgment briefs do not support these assertions with any record evidence. Plaintiff claims that he "continues to suffer from severe headaches, memory loss, blurred and total loss of vision, reoccurring light headedness, dizziness, an inability to concentrate or sleep, slow verbal and physical responses, extreme neck and back pain, and other ailments." [58, ¶ 46.]

## II. Legal Standard

### A. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[O]nce a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019) (internal quotation marks omitted). It is not the role of the Court to weigh evidence or assess credibility, but rather to determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. In evaluating the record, the Court will construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in his favor. *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021).

### III. Analysis

The Eighth Amendment's prohibition on cruel and unusual punishment requires prison officials to avoid "the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 102–103 (1976) (internal quotation marks omitted). Therefore, although "[t]he Constitution 'does not mandate comfortable prisons,' . . . it [does not] permit inhumane ones" either. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). The obligation to head off "unnecessary suffering" broadly demands that prison officials "'take reasonable measures to guarantee the safety of . . . inmates[]'" in the face of known peril, regardless of its source. *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). Accordingly, where a prison official is actually aware of "an excessive risk to inmate health or safety," he may not shrug it off and turn a blind eye. *Id.* at 837. Such deliberate indifference to prisoner-well-being is "offensive to 'evolving standards of decency,'" and, therefore, the Constitution. *Gutierrez v. Peters*, 111 F.3d 1364, 1371 (7th Cir. 1997) (quoting *Estelle*, 429 U.S. at 106).

Applying these principles, courts have found the Eighth Amendment implicated by indifference to a wide variety of threats. *Petties v. Carter*, 836 U.S. 722 (7th Cir. 2016) (*en banc*) (failure to properly treat ruptured Achilles tendon); *Sinn v. Lemmon*, 911 F.3d 412 (7th Cir. 2018) (failure to protect inmate from violent attack by other inmates); *Hall v. Bennett*, 379 F.3d 462 (7th Cir. 2004) (failure to protect inmate from electrocution suffered while working prison job). Nevertheless, while the Eighth Amendment offers broad protection to inmates threatened with preventable injury, "it does not apply to every deprivation, or even every unnecessary deprivation, suffered by a prisoner." *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996) (internal quotations omitted).

Rather, "a prison official violates the Eighth Amendment only when two requirements are met." *Farmer*, 511 U.S. at 834. First, an inmate must show that "the deprivation alleged" is, as an objective matter, "'sufficiently serious[]'" that it "result[s] in the denial of 'the minimal civilized measure of life's necessities.'" *Id.* (quoting *Rhodes*, 452 U.S. at 347). "For a claim . . . based on failure to prevent harm," this standard is satisfied where an inmate is "incarcerated under conditions posing a substantial risk of serious harm." *Id.*; see also *Edwards v. Snyder*, 478 F.3d 827, 830 (7th Cir. 2007) ("A deliberate indifference claim requires . . . an objectively serious risk of harm . . . ."). For claims based on inadequate medical care, an inmate must prove that he suffers (or suffered) from an "objectively serious medical condition." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

However, the mere fact that an inmate is subjected to a serious risk of harm does not, itself, violate the Eighth Amendment. An inmate must also prove that a prison official was deliberately indifferent to that risk. "Deliberate indifference is a subjective mental state," *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022), "akin to criminal recklessness." *Norfleet v. Webster*, 439 F.3d 392, 397 (7th Cir. 1996). It "requires that the defendant be aware of and disregard an excessive risk of serious harm to the inmate." *Id.*; see also *Petties*, 836 F.3d at 728 ("[A] plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." (emphasis original)). This requirement is rooted in the text of the Eighth Amendment itself, which proscribes cruel and unusual *punishment*, not "cruel and unusual 'conditions.'" *Farmer*, 511 U.S. at 837. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." *Id.* at 838.

In this case, Plaintiff claims that Stateville officials and Wexford physicians were deliberately indifferent to two things—(1) the risk posed to his safety by the commissary ceiling; and (2) his allegedly severe head injury.

### A. Wexford Defendants

#### 1. *Dr. Obaisi*

Dr. Obaisi passed away on December 23, 2017. [49-1.] On March 5, 2018, the Wexford Defendants filed a suggestion of death on the record. [49.] Attached to that filing was a declaration by Ghaliah Obaisi, Executor of Dr. Obaisi's Estate, consenting to service of any motion for substitution by email. [49-2, ¶ 2.] Nevertheless, Plaintiff ultimately failed to substitute Dr. Obaisi's Estate. The Wexford Defendants argue that this requires mandatory dismissal of Plaintiff's claims against Dr. Obaisi by automatic operation of Federal Rule of Civil Procedure 25(a)(1). That rule provides that if a "motion for substitution . . . is not made within 90 days after service of a statement noting the death" of a party, "the action by or against the decedent must be dismissed."

Although Rule 25(a)(1) does use seemingly mandatory language, courts may, on a finding of "excusable neglect," permit untimely substitution. *Continental Bank, N.A. v. Meyer*, 10 F.3d 1293, 1297 (7th Cir. 1993) ("[T]he history of Rule 25(a) and Rule 6(b) makes it clear that the 90 day time period was not intended to act as a bar to otherwise meritorious actions, and extensions of the period may be liberally granted." (internal quotation marks omitted)). However, the Court does not find Plaintiff's failure to substitute Dr. Obaisi's Estate in this case to be justified. Although Plaintiff's attorney was appointed by the Court on April 3, 2018, nearly a month after the suggestion of death was filed on the docket, he still had more than 60 days to substitute Dr.

Obaisi's Estate. In any case, Plaintiff does not contest the entry of summary judgment on Count IV of his Second Amended Complaint. [179, PRDSOF, ¶ 4.]

## 2. *Dr. Martija*

To prevail against Dr. Martija, Plaintiff must first prove "that he suffer[ed] from an objectively serious medical condition." *Pyles*, 771 F.3d at 409. A medical condition is objectively serious "if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Id.*

Plaintiff claims to suffer from the long-term consequences of blunt-forced trauma to the head. He refers to his condition variously as a "traumatic brain injury," [58, ¶ 23], a "head injury," [178, p. 3], and a "neurological injury." [178, p. 4.] However it is characterized, Plaintiff's alleged injury, and the symptoms he claims have resulted from it, plainly constitute an objectively serious medical condition. This was true in the immediate aftermath of Plaintiff's injury as well as in the months that followed (assuming, of course, that a jury believes his reported long-term symptoms). And although Defendants dispute whether Plaintiff was *actually* struck in the head by falling wood as he claims, they nonetheless concede that there is sufficient evidence in the record to create a genuine dispute of material fact on the issue. See [166, pp. 5, 11.]

But Plaintiff must do more than show that he suffered from a serious medical condition. He must also show that Dr. Martija "*actually* knew of and disregarded a *substantial* risk of harm" arising out of that condition. *Petties*, 836 F.3d at 728 (emphasis added). This is where Plaintiff's claim founders. Not only has Plaintiff failed to precisely specify what risk Dr. Martija's treatment decisions exposed him to (or, for that matter, what injury they caused him), he has also failed to show that Dr. Martija's treatment decisions were driven by anything other than professional judgment, erroneous or not.

In a case like this one, where the defendant medical provider is alleged to have provided constitutionally inadequate treatment, rather than no treatment at all, a plaintiff must prove that the defendant was aware of, and indifferent to, "a risk from [the] particular course of medical treatment" she opted to provide. *Petties*, 836 F.3d at 728. A jury can reasonably infer such knowledge if "a risk from a particular course of medical treatment (or lack thereof) is" sufficiently "obvious." *Id.*; *Norfleet*, 439 F.3d at 396 ("'[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" (quoting *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002)). However, "in those cases where" the risks from a particular course of treatment "may be imperceptible to a lay person," inmates must show that the defendant's "treatment decision [was] . . . 'such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that [she] did not base the decision'" on such judgment at all. *Petties*, 836 F.3d at 728 (quoting *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996)).

It is not enough to show that the defendant *should* have known that her chosen course of treatment posed an unnecessary risk of substantial harm to her patient. Without evidence of subjective knowledge, such a finding shows only that the defendant was negligent. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. "Even objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it should be known—is insufficient to make out a claim." *Petties*, 836 F.3d at 728. For these reasons, "evidence that some medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim," unless it demonstrates such "sub-minimal competence" that a jury can rationally infer that the defendant knowingly took an unnecessary risk. *Petties*, 836 F.3d at 728. In short, evidence of competing

medical opinion can permit an inference of knowledge only when it renders implausible an assertion of well-intentioned care.

Plaintiff's deliberate indifference claim against Dr. Martija is essentially premised on her alleged failure "to fully evaluate Plaintiff's injury." [178, p. 4.] According to Plaintiff, Dr. Martija should have (1) "perform[ed] regular medical check-ups," (2) conducted more thorough "physical examinations, including cranial nerve and general neurological examinations," and (3) referred Plaintiff to Dr. Obaisi, who could in turn refer Plaintiff to an outside specialist "for the imaging and diagnostic testing he needed, including a CT scan or an MRI." [*Id.*] Plaintiff argues that Dr. Martija's failure to do these things is all the more problematic in light of her limited "experience treating patients with brain injuries." [*Id.*] He contends that, taken together, Dr. Martija's course of treatment coupled with her lack of relevant experience was "a substantial departure from accepted medical judgment and therefore deliberately indifferent to Plaintiff's serious medical needs." [*Id.*]

In support of his position, Plaintiff cites to the expert affidavit of Dr. Michael Treister, a physician specializing in orthopedic medicine. [179-6.] In this affidavit, Dr. Treister expresses his opinion that "[a]ppropriate and responsible medical care" for Plaintiff's condition "would have, at a minimum, included regular medical check-up visits," "physical examination documentation of at least [the] cranial nerve," and a "general neurological examination." [*Id.* at ¶ 7(c).] He further concludes that "a brain MRI" and "CT scan of the head" should have been conducted in "the weeks and months after the incident," "[e]ven if the likelihood of positive findings was low." [*Id.* at ¶¶ 7(d)–(f).] Finally, he finds "[t]he lack of reasonable post infirmary follow-up . . . medically troublesome for a potential head injury." [*Id.* at ¶ 7(b).]

Defendants challenge the admissibility of this evidence on two grounds. First, they argue that Plaintiff's failure to disclose Dr. Treister's as a potential expert witness in accordance with Federal Rules of Civil Procedure 26(a) and (e) merit exclusion under Rule 37(c)(1). That rule provides that a party who "fails to provide information or identify a witness as required by Rule 26(a) or (e) . . . is not allowed to use that information or witness to supply evidence on a motion," "unless the failure was substantially justified or harmless." Alternatively, Defendants argue that Dr. Treister's opinions should be excluded under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), because Dr. Treister is not qualified, as an orthopedist, to give an opinion on Plaintiff's neurological condition. The Court need not address either of these arguments, however, because *even* upon consideration of Dr. Treister's expert opinions, Plaintiff has failed to create a genuine issue of material fact that Dr. Martija was deliberately indifferent to a serious risk to his health.

Perhaps the most serious problem with Plaintiff's claim is his failure to precisely define the risk to which Dr. Martija allegedly exposed him. In this case, it is not intuitively obvious how any of the treatment decisions Plaintiff challenges threatened him with serious harm. He does not explain what information a more thorough medical examination, or more frequent check-ups, might have revealed and how treatment made possible by such care might have averted a health risk or reduced the severity of his symptoms. The absence of such information is particularly glaring in light of the fact that the diagnostic imaging that Plaintiff *did* receive showed nothing abnormal.

It simply will not do for Plaintiff to vaguely allege that "Dr. Martija knew of Plaintiff's objectively serious medical condition and the excessive risk it posed." [178, p. 4.] Without information about what this risk entailed, it would not possible for a jury of laypersons to assess whether, let alone conclude that, Dr. Martija's care was "'so far afield of accepted professional

standards as to raise the inference that it was not based on a medical judgment.'" *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)).

Dr. Treister's opinions at most support a finding that the course of treatment pursued by Dr. Martija was negligent. He does not explain *why* Dr. Martija's care was concerning—that is, what *risks* to Plaintiff's health it may have created. Without this information, it is impossible to gauge whether Dr. Martija's treatment decisions created such an obvious risk to Plaintiff's health that a jury would be warranted in inferring that she was actually, subjectively aware that her actions threatened injury. Unlike many other deliberate indifference cases, Plaintiff has not suffered an injury subsequent to Dr. Martija's care that might confirm the inadequacy of her treatment. Plaintiff has provided no evidence confirming his claim that his symptoms have deteriorated. The diagnostic imaging that he ultimately received showed nothing abnormal.

Events subsequent to Dr. Martija's care seem to confirm, rather than cast doubt on, her professional opinion that Plaintiff was not in need of urgent or emergent medical care, either during the 23-hour period of medical observation immediately after his accident or on October 16, 2015, ten days later. During Plaintiff's initial stay in the Stateville infirmary and at his follow-up appointment, Dr. Martija conducted a gross neurological examination on Plaintiff. She explained that (at least in her opinion) a normal finding on such an examination is likely to be confirmed by a more thorough examination. Plaintiff consistently tested normally on those examinations, and, by October 16, 2015, Dr. Martija found that his symptoms had actually improved. Plaintiff has not pointed to any evidence inconsistent with this account and has, therefore, failed to create a genuine issue of material fact that Dr. Martija was deliberately indifferent.

3. Monell *Claim Against Wexford*

Municipal bodies are "persons" within the meaning of 42 U.S.C. § 1983 and can be sued for infringing upon rights secured by federal law, including the Eighth Amendment. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694–95 (1978). However, because "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory," *id.* at 691, a municipality can only be liable if it maintained a policy or custom that "was the 'moving force' behind the federal rights violation." *Bohanon v. City of Indianapolis*, 46 F.4th 669, 675 (7th Cir. 2022).

An official policy or custom can take many forms, including "(1) an official policy adopted and promulgated by [the body's] officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an" act taken by an "official with final policy-making authority." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). However, where a municipal policy does not "facially violate[] a federal right," "'rigorous standard[s] of culpability . . . appl[y] to ensure that the municipality is not held liable solely for the actions of its employee.'" *First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 986–87 (7th Cir. 2021) (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 405 (1997)). Under these circumstances, "the plaintiff must demonstrate that the policy was adopted "'with 'deliberate indifference'' to the plaintiff's constitutional rights," "a high bar." *Id.* (quoting *Brown*, 520 U.S. at 407).

Whether or not official policy is facially violative of federal rights, a plaintiff must still "prove that the municipality's action was the 'moving force' behind the federal-rights violation." *Id.* "This is a 'rigorous causation standard' that requires the plaintiff 'to show a 'direct causal link'

between the challenged . . . [policy] and the violation of his constitutional rights.'" *Bohanan*, 46 F.4th at 675–76 (quoting *LaPorta*, 988 F.3d at 987).

Although *Monell* itself concerned "municipal corporations," the Seventh Circuit has since held that "a private corporation that has contracted to provide essential government services is subject to at least the same rules that apply to public entities." *Glisson v. Ind. Dep't of Corr.*, 948 F.3d 372, 378–79 (7th Cir. 2017). Applying this principle, the Seventh Circuit has consistently held that Wexford, which contracts with the Illinois Department of Corrections to provide medical care to inmates at IDOC facilities, can be sued under 42 U.S.C. § 1983. See, *e.g.*, *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014); *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020).

Plaintiff alleges that Wexford maintained an official policy of "denying medical care and treatment to inmates incarcerated at Stateville in order to cut costs and save money."[3] [178, p. 6.] He further claims that, as a result of this policy, he was "not allowed to see a specialist for evaluation of his worsening medical condition." *Id.* Plaintiff's evidence on this score is limited to conversations that he claims to have had with Wexford staff. At his deposition, Plaintiff stated that Dr. Obaisi told him that "his bosses directly" told him that "they had to save money over [his] medical needs . . . ." [181-1, 24:23–25:3.] He further claimed that other Wexford employees told him that "even if they want[ed] to" do "certain things" he asked for, "they couldn't . . . because of their bosses or their policies." *Id.* at 26:11–18. The only other employee he remembers by name is Wendy Olson, a nurse who told him that "she wanted to help people along but she [couldn't] because of the money issue." *Id.* at 26:19–27:6.

---

[3] Although Plaintiff's Second Amended Complaint alleges that Dr. Obaisi "had final policy and decision making authority with regard to Plaintiff's medical treatment and care," [58, ¶ 73], Plaintiff did not make this argument in response to Defendants' motion for summary judgment. Therefore, it is waived.

Wexford argues that this evidence is insufficient to create a genuine issue of material fact as to the existence of the alleged policy. [166, p. 12]; [185, p. 10.] It points to several cases that it claims stand for the principle that a plaintiff attempting to prove the existence of a widespread policy or custom may not do so "solely on [the basis of] his own experience." [166, p. 13]; *Grieveson v. Anderson*, 538 F.3d 763 (7th Cir. 2008); *Taylor v. Wexford Health Sources, Inc.*, 2016 WL 3227310 (N.D. Ill. June 13, 2016); *Arita v. Wexford Health Sources, Inc.*, 2016 WL 6432578 (N.D. Ill. Oct. 31, 2016). But in *Grieveson*, the Seventh Circuit was careful to "note that it is not impossible for a plaintiff to demonstrate the existence of an official policy or custom by presenting evidence limited to his experience." 538 F.3d at 774. While "it is necessarily more difficult" to do so, there is no rule requiring an inmate to corroborate his own experience with those of other inmates. *Id.*

In any event, these cases are inapposite. Each involved an attempt to prove the existence of an institutional custom or policy inferentially by pointing to the occurrence of a series of individual incidents. See, *e.g.*, *Grieveson*, 538 F.3d at 774 (evidence consisting of "four incidents" and a corroborating medical record). But this is just one method of proving the existence of a custom or policy. Unlike the inmates in those cases, Plaintiff claims that Dr. Obaisi explicitly told him that Wexford has a specific policy of withholding necessary medical care in the interest of cutting costs. Dr. Obaisi, who was the Medical Director at Stateville, was presumably in a position to know this policy, particularly in light of the fact that inmates in need of outside referrals were sent to him for an "independent evaluation." [179-1, Martija Dep. Tr. 33:1–12.] A reasonable jury finding Plaintiff's testimony credible might well conclude that Wexford maintains the policy Plaintiff claims.

But several problems with Plaintiff's *Monell* claim remain, the most significant of which is his failure to prove an underlying constitutional violation. Because the Court has found that Dr. Martija was not deliberately indifferent to Plaintiff's medical needs, he must present evidence upon which a reasonable jury could find that Dr. Obaisi was. See *Thomas*, 604 F.3d at 305 ("[A] municipality can be held liable under *Monell*, even when its officers are not . . . ."). Plaintiff has chosen not to contest the entry of summary judgment in favor of Dr. Obaisi, and his brief in opposition to Defendants' motion for summary judgment does not develop this argument. Therefore, it is arguably waived. *Montgomery v. Scialla*, 2022 WL 971476, at *14 (N.D. Ill. Mar. 31, 2022) ("Plaintiff has waived any argument by failing to make even a superficial legal argument on this score.").

In any event, even if the Court were to find that Plaintiff has not waived this argument, it nonetheless fails on the merits. The only deliberate indifference theory against Dr. Obaisi that the parties' respective statements of fact even plausibly support is one premised on his refusal, for a time, to refer Plaintiff to see an outside specialist and for diagnostic imaging. [179, PSOAF, ¶¶ 4, 13–16.] But the Seventh Circuit has made clear that to prove a deliberate indifference claim based on delayed (rather than withheld) treatment, the plaintiff "must . . . provide independent evidence that the delay *exacerbated the injury or unnecessarily prolonged pain*." *Petties*, 836 F.3d at 730–31 (emphasis added); see also *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007) ("[A] plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental.").

In this case, Plaintiff concedes that his CT scan results were normal. [179, PRDSOF, ¶ 38.] Furthermore, Plaintiff has shown neither that his symptoms worsened during the delay nor that any of the interventions he sought would have alleviated his symptoms. Again, although the

Treister affidavit questions the quality of the care Dr. Obaisi provided to Plaintiff, it does not claim, much less explain, how that care contributed to any deterioration in Plaintiff's health. [179-6.] In light of this crucial hole in the record, the Court finds that Plaintiff has failed to create a genuine issue of material fact that Dr. Obaisi was deliberately indifferent to Plaintiff's medical needs.

In the absence of a viable claim against either Dr. Obaisi or Dr. Martija, Plaintiff simply cannot prove an underlying constitutional violation for which Wexford can be held responsible. Therefore, the court enters summary judgment in favor of Wexford as well.

## B.    IDOC Defendants

### 1.  *Individual Capacity Claims*

Plaintiff's claims against the IDOC Defendants present a much closer question. As an initial matter, Plaintiff must show that the threat posed by the commissary ceiling was objectively serious. This does not mean that he must prove that he "was especially likely" to be injured by it. *Sinn*, 911 F.3d at 421 (internal quotation marks omitted). Rather, it suffices to show that the commissary ceiling posed a serious risk to inmates using the commissary generally. *Id.* ("'[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk . . . for reasons personal to him or because all prisoners in his situation face such a risk.'" (quoting *Farmer*, 511 U.S. at 843)).

Unlike the Wexford Defendants, the IDOC Defendants dispute whether Plaintiff has met his burden on this issue.[4] They argue that Plaintiff's injury, if it actually occurred, was a "random accident," akin to an inmate slipping on a wet shower floor. [170, p. 6.] They emphasize that

---

[4] Although in both of the IDOC Defendants' briefs, these arguments are housed under headings concerning the subjective component of Plaintiff's deliberate indifference claim, they clearly speak to the objective severity of the risk posed by the commissary ceiling as well. Accordingly, the Court will consider these arguments, to the extent they can be, challenges to the sufficiency of the evidence on the objective component of Plaintiff's claim.

Stateville suffered from similar maintenance problems throughout the facility and argue that if the risk posed by the commissary ceiling is objectively serious, so must be the risk posed by countless other facilities at Stateville. [187, p. 7.] They further contend that the fact that Defendant Lamb deemed Plaintiff's emergency grievance a non-emergency is strong proof that the commissary ceiling was not as dangerous as Plaintiff claims. [170, p. 6]; [187, p. 8.]

Although Plaintiff does not clearly frame the "risk" in this case, the only reasonable way to understand his claim is that Defendants were deliberately indifferent to the risk that pieces of wood and debris heavy enough to cause serious injury might fall and injure inmates using the commissary. Plaintiff does not dispute that "[t]he ceiling tiles in the commissary are made of a substance similar to foam paper, which is extremely light weight," likely "less than one pound" per tile. [167, ¶ 67.] It is implausible that such tiles could injure anyone, let alone seriously. Therefore, although portions of Plaintiff's brief speak to the "dangers the falling ceiling tiles posed to inmates in the commissary," [180, p. 5], it makes little sense to construe Plaintiff's claim this way, and the Court will not.

Properly construed, the Court finds that Plaintiff has created a genuine issue of material fact that the risk to inmate safety posed by the commissary ceiling was objectively serious. Assuming, as it must at this stage in the litigation, that each of Plaintiff's offender requests, as well as his emergency grievance, accurately reported actual incidents in the commissary, a reasonable jury could conclude that the commissary ceiling threatened serious injury.

On six separate occasions over a period of more than two years, Plaintiff warned Defendants that the ceiling and roof were falling down and that this could seriously hurt someone. Two of Plaintiff's offender requests specifically reference falling wood, precluding any inference that in referring to the ceiling "falling down" Plaintiff might have meant the commissary's

32

innocuous ceiling tiles. [181-6.] Plaintiff's emergency grievance, moreover, which was sent just months before his alleged injury, explains not only that wood was falling but also that the wood in the commissary ceiling (presumably the support beams) was *rotting*. A jury crediting the veracity of these reports could rationally conclude that, due to the well-documented leaks in the commissary roof, the commissary support beams were exposed to moisture and began to rot as a result. This might explain how wood from the ceiling could suddenly fall to the ground.[5] The danger this might pose to inmates waiting to use the commissary is self-evident.

Although Defendants appear to question the "incredibly fortuitous circumstance" that Plaintiff, after "consistently filing multiple complaints and grievances dating back to July 21, 2013, . . . happened to be the inmate sitting underneath the defect on the night that 'unprecedented tragedy' struck," [187, p. 8], it is not this Court's role to take a position on the veracity of Plaintiff's offender requests. Quite the opposite—at this stage in the litigation, the Court must interpret the facts in the light most favorable to Plaintiff, and the Court cannot say that Plaintiff's offender requests are so lacking in authenticity that no rational jury could deem them genuine.

None of Defendants' remaining arguments on this issue are meritorious. First of all, if it is true that heavy pieces of wood had fallen from the commissary ceiling on several occasions in the years preceding Plaintiff's injury, it is clear that Plaintiff's injury was not the result of a "random accident." Rather, Plaintiff's injury could be seen as the predictably severe consequence of an ongoing problem. Defendants' contention that the ubiquity of similar maintenance issues at Stateville renders it implausible that the commissary poses an objectively serious risk likewise

---

[5] The Court notes that even the offender requests that do not reference wood nonetheless warn that serious injury might result if measures are not taken to protect inmates. Given the undisputed fact that the commissary's ceiling tiles are extremely lightweight, a rational jury crediting the veracity of this evidence might also conclude that these requests document previous instances of falling wood, or at least debris heavy enough to injure.

falls flat. The Court is aware of nothing in the Safety & Sanitation reports Defendants cite referencing falling wood, so the problem in the commissary is not comparable. But even if other portions of Stateville suffered from similar problems, the mere fact that a risk is ubiquitous does not suddenly mean that it cannot pose an objectively serious risk to inmate safety. Finally, the fact that Plaintiff's emergency grievance was deemed a non-emergency does not immunize Defendants from constitutional scrutiny. The Eighth Amendment looks to the objective severity of a risk to inmate safety, not the subjective opinions of prison officials tasked with keeping inmates safe.

But it is not enough for Plaintiff to prove that the commissary ceiling risked serious harm to the inmates that used the commissary. He must also adduce evidence upon which a rational jury could conclude that *each* of the IDOC Defendants was *aware* of this risk and consciously disregarded it anyway. This is no easy feat. As the Seventh Circuit has recognized, "except in the most egregious cases, plaintiffs generally lack direct evidence of actual knowledge." *Petties*, 836 F.3d at 728. Because "[p]rison officials do not typically proclaim that they violated the Constitution by ignoring a known risk," plaintiffs in this area must generally rely on circumstantial evidence and inference. *Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022).

While the record is replete with references to deteriorating, and even falling, ceiling tiles, it speaks little to deteriorating support beams. In fact, with the exception of Plaintiff's offender requests and emergency grievance, the Court is aware of no other evidence that expressly refers to falling wood or debris. This presents a serious challenge for Plaintiff, because it is not enough for him to prove that the IDOC Defendants were "aware of facts from which the inference could be drawn that" wood might fall from the commissary ceiling. *Farmer*, 511 U.S. at 837. He must also prove that they "dr[ew] th[at] inference." *Id.*

34

It is certainly true that a reasonable person examining the commissary's ceiling tiles could infer the possibility that leaks from the roof might also be affecting the structural integrity of the commissary's support beams. However, the Court does not think that this inference is so obvious that a factfinder could conclude, without more, that any Defendant cognizant of the commissary's leaking roof actually knew that the wooden beams were at risk of rotting and falling away. *Farmer*, 511 U.S. at 836 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that it was obvious."). As Defendants accurately note, Stateville had a problem with leaky roofs and ceiling tile decay throughout the prison. In spite of this fact, there is no evidence in the record that wood in any other portion of the facility had rotted or fallen to the ground. If anything, this is strong evidence that Defendants would not have intuitively drawn the connection between deteriorating ceiling tiles and decaying support beams. Therefore, the Court finds that Plaintiff must show more than mere knowledge of the problems with the commissary roof and ceiling tiles. He must also show that each Defendant learned of previous incidents—whether through Plaintiff's prison communications or by virtue of their respective job responsibilities at Stateville.

Plaintiff invokes the systemic condition doctrine in an attempt to prove subjective knowledge on the basis of Defendants' positions alone. Under that doctrine, a jury may rationally infer that high-ranking prison officials were aware of—or even participated in the creation of—prison conditions that are "systemic, as opposed to localized." *Antonelli v. Sheahan*, 81 F.3d 1422, 1429 (7th Cir. 1996). This doctrine appears to have had its genesis in cases at the motion to dismiss stage of litigation. However, as Plaintiff correctly explains, it has been applied by the Seventh Circuit at summary judgment as well. *Gray v. Hardy*, 826 F.3d 1000, 1008–09 (7th Cir. 2016).

The strength of the systemic condition inference would seem to depend on (1) the number of prisoners exposed to a given condition and (2) the frequency of that exposure. As more prisoners are exposed to a condition on a more frequent basis, it becomes more reasonable to infer that a prisoner or official *somewhere* alerted a high-ranking prison official to its presence. It is perhaps unsurprising, then, that the systemic condition doctrine has been applied most often in cases challenging conditions or policies that affect a large number of prisoners on a more-or-less continuous basis. See, *e.g.*, *Perkins v. Williams*, 2018 WL 453743, at *4 (N.D. Ill. Jan. 17, 2018) (pest infestations, inadequate access to personal hygiene products, and policy affecting access to cleaning supplies); *Dodson v. Cook Cty. Jail*, 2019 WL 76401, at *1 (N.D. Ill. Feb. 21, 2019) (exposure to mold, dust, mildew, contaminated drinking water, and other toxins).

Recognizing that "no bright-line test" separates systemic from localized conditions, *Britton v. Williams*, 2017 WL 4410117, at *4 (N.D. Ill. Oct. 4, 2017), the Court declines Plaintiff's invitation to apply the systemic condition inference in this case. Although it is true that Stateville has only one commissary, one that inmates presumably visit on a somewhat routine basis, the nature of the risk in this case differentiates it from cases where the systemic condition inference has been found appropriate.

Unlike mold, an infestation, or even a prison policy, each of which expose large portions, if not the entirety, of a correctional facility to its effects day-after-day, the record in this case does not suggest that wood from the commissary ceiling was falling with any regular frequency. As the number of incidents resulting from, and the number of inmates exposed by, any given risk falls, so does the likelihood that senior prison officials are alerted to the problem. This is not the kind of case where the combination of those factors is sufficient to justify an assumption of knowledge. The commissary is just one room among many in a prison that is apparently rife with maintenance

36

issues.  Were the systemic condition doctrine sufficient to overcome summary judgment in this case, it would resemble something more akin to a constructive notice principle than a reasonable inference appropriate in certain cases.

Without the aid of the systemic condition doctrine, Plaintiff's primary evidence of subjective knowledge is the offender requests and emergency grievance he claims to have sent the IDOC Defendants.   It is not enough, however, for Plaintiff simply to produce these communications and allege that he sent them to each IDOC Defendant.  Although "[a]n inmate's letters to prison administrators may establish a basis for § 1983 liability," there is no "ironclad rule" that such a communication "constitutes adequate notice" of a dangerous prison condition. *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996).  Rather, a "plaintiff . . . has the burden of demonstrating that the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to 'an excessive risk to inmate health or safety.'" *Vance*, 97 F.3d at 993.  Furthermore, evidence that a given prison official, whether by virtue of custom or official policy, does not read certain kinds of prisoner communications may warrant summary judgment in the absence of other evidence of notice.  See *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006) ("Critically, there is no evidence that Snyder actually read Johnson's communications or had any subjective awareness of Johnson's condition. To the contrary, there is evidence that Snyder does not review inmate correspondence relating to grievances; that task is delegated to subordinates.").

With these principles in mind, the Court will now assess the sufficiency of the evidence to create a genuine issue of fact as to the subjective knowledge of each of the IDOC Defendants.

***Defendant Lamb.***  Plaintiff's strongest case is against Defendant Lamb.  On August 19, 2015, Plaintiff sent Lamb an emergency grievance warning of "rotten and falling wood" that posed

a "risk" to inmate "safety." [181-5.] Defendant Lamb cannot claim that the grievance did not reach his office—it is signed in his name. And although he claims that he does not recognize the signature, the fact that the grievance is apparently signed by Lamb is strong evidence of knowledge, sufficient to create a genuine dispute of fact on the issue. Although Defendant Lamb claims that the only commissary maintenance issue of which he was aware was the deterioration of the commissary's ceiling tiles, this testimony does not warrant the entry of summary judgment. Similarly, the mere fact that Defendant Lamb claims that he believed Plaintiff's complaint to constitute a non-emergency is not enough either. It is for a jury to assess the credibility of such testimony, not this Court.

***Defendant Wright.*** Plaintiff's next strongest claim is against Defendant Wright. On January 16, 2015, Plaintiff sent Defendant Wright an offender request warning that "[t]he roof and ceiling [was] falling down in the commissary building." [181-7, Ex. F.] Unlike the emergency grievance Plaintiff sent to Defendant Lamb, this offender request does not specifically reference falling wood or debris. The Court finds that a rational jury could nonetheless infer knowledge of a serious risk to inmate safety on the basis of its content.

The Wright offender request warned that "the roof *and* ceiling" in the commissary building were "falling down" and "put [inmates] at a serious risk of harm." [*Id.*] As the Court has previously explained, it simply would not make sense for Plaintiff to believe that the foam ceiling tiles, which weigh less than a pound, could seriously hurt anyone were they to fall. A reasonable jury could find that Wright, in light of Plaintiff's warning that someone could be *seriously* injured, understood Plaintiff's offender request to refer to wood or heavy debris, particularly in light of Plaintiff's reference to both the ceiling and roof, rather than the ceiling alone, as well as Wright's familiarity with the commissary.

38

As was the case for Defendant Lamb, there is corroborating evidence in the record that Defendant Wright actually received and read this offender request. Plaintiff claims to have followed up on the offender request in person. He claims that Wright, in response to Plaintiff's asking him what he thought about the issues identified in the offender request, told him that he was "aware of it." [181-1, Willis Dep. Tr. 120–122.] And although Defendant Wright does not remember this conversation, he acknowledges that he submitted a work order to the Chief Engineer in January of 2015 related to the commissary roof. [181-13, Wright Dep. Tr. 32–33.] Wright does not remember whether he submitted the work order after Plaintiff sent his offender request, but a rational jury could find that the two are linked and that Defendant Wright's work order sought to address the issues identified by Plaintiff in his request. Therefore, the Court finds that Plaintiff has created a genuine issue of fact as to Defendant Wright's knowledge of the conditions in the commissary.

### Defendants Louch and Johnson.

According to both Defendant Louch and Defendant Johnson, Chief Engineers did not receive offender requests, although there is some testimony by Defendant Lemke to the contrary. [181-12, Johnson Dep. Tr. 44:13–45:7]; [181-9, Louch Dep. Tr. 17:2–10.]; [181-10, Lemke Dep. Tr. at 20:9–21:5.] The Court need not dwell on this inconsistency in the record because it finds that a rational jury could infer, on the basis of each Defendant's personal responsibility for the work orders submitted by Defendant Wright in 2014 and 2015, that each Defendant was aware of the incidents in the commissary and the risk that the conditions in the commissary posed to inmate safety.

As the Court has just explained, a rational jury could conclude that the work order submitted by Defendant Wright in January 2015—the same month that he received an offender

request from Plaintiff warning that the commissary roof and ceiling were falling down and threatened inmate safety—was related to that risk of harm. Defendant Wright submitted other work orders the year before that also related to commissary maintenance. In January of 2014, Wright put in a commissary work order that he claims related to cracks in the ceiling and chipped or peeling paint. [181-13, Wright Dep. Tr. 42–43.] That work order was not promptly addressed, and Wright felt compelled to follow up on it more than once. In February of 2014, he spoke with "the clerk" of the office of the Chief Engineer, who told him that "[t]hey were trying to put a plan together to fix" the commissary. [*Id.* at 47:4–14.] Then, after several months of inaction, Defendant Wright claims to have spoken with Defendant Louch directly. Louch allegedly told Wright "[t]hat he was made aware of the situation and he would have his guys take care of it as soon as he could." [*Id.* at 52:14–18.]

Defendant Wright was assigned to the commissary "from 2012 through 2015." [*Id.* at 79:1–5.] If a jury were to believe Plaintiff's claim that wood and debris had been falling with some frequency during that period, it could also reasonably infer that Defendant Wright would have been aware of those incidents. Unlike any of the other IDOC Defendants, Defendant Wright was responsible for overseeing the commissary process and would have spent as much time, if not more, in the facility than the prisoners he supervised. Plaintiff's claim that Wright told him that he was "already aware" of the issues in Plaintiff's January 16, 2015, offender request would permit a rational juror to further infer that the January 2014 work order was about more than mere paint chips and cracks. After all, Defendant Wright thought the repairs he requested urgent enough to warrant several follow-ups with the clerk of the Chief Engineer and then the Chief Engineer himself. Furthermore, the fact that the Chief Engineer and his staff were apparently "trying to put

40

a plan together to fix" the issues flagged by Wright, suggests that the problems with the commissary might have been more serious than mere ceiling tile cracks and peeling paint.

The Chief Engineer at Stateville on the date that these requests were submitted would have been responsible for, *inter alia*, "prioritiz[ing] work orders, delegat[ing] maintenance jobs to tradesmen, and "follow[ing] up on the completion" of those jobs. [181-9, Louch Dep. Tr. 20:23–21:5, 27:23–28:3, 28:24–29:14.] Therefore, if a jury were to believe that the work orders submitted by Defendant Wright concerned the incidents reported by Plaintiff in his offender requests, it could also infer that the Chief Engineer to which they were submitted was aware of them as well.

According to Defendant Johnson, he worked as Chief Engineer of Stateville for just nine months, around Fall of 2013 into the middle of 2014. [181-12, Johnson Dep. Tr. 54:5–16.] The precise end-date of Defendant Johnson's tenure is not clear, but Defendant Wright remembers following up on his January 2014 work order, in April 2014, with Defendant Louch, not Defendant Johnson. Combining Defendant Johnson's testimony with Defendant Wright's, it is apparent that Defendant Johnson was Chief Engineer in January of 2014 and left sometime over the next several months. Both Defendant Johnson and Defendant Louch, however, were Chief Engineers at Stateville during the submission of work orders by Defendant Wright in 2014. Defendant Johnson, moreover, was likely still in charge when Defendant Wright followed up on the January 2014 work order for the first time. Given the direct, personal responsibility each Defendant would have had to take care of the issues identified in those orders, the Court finds that a jury could rationally conclude that they were aware of the conditions in the commissary and the threat those conditions posed to inmate safety.

The Court's conclusion is bolstered by the awareness of both Defendants of problems with the commissary. As the Court recounted above, Defendant Johnson was well aware of the

problems with the commissary roof and had actively sought to address them. [181-12, Johnson Dep. Tr. at 90:23–91:6.] Moreover, when asked whether he had "ever follow[ed] up with a carpenter regarding a work request related to the commissary roof or ceiling," Defendant Louch responded that he "vaguely remember[ed] some issues, but . . . just [couldn't] recall." [181-9, Louch Dep. Tr. 31:1–6.] These expressions of general knowledge coupled with each Defendant's personal responsibility over the work orders submitted by Defendant Wright are sufficient to create a genuine issue of fact as to their subjective knowledge of the risk posed to inmate safety by the commissary.

*Defendant Lemke and Williams.* Plaintiff's claims against Defendants Williams and Lemke are much closer calls. Defendant Lemke left Stateville in December 31, 2013, before Defendant Wright put in the January 2014 or January 2015 work orders. Defendant Williams took another job in a different prison in July of 2015. Although each Defendant had ultimate responsibility for maintenance at Stateville, neither would have been involved in the day-to-day maintenance and repair of Stateville. According to Defendant Lamb, only "major issues" were reported up the chain, and perhaps even then only to the AWO rather than the Warden. [181-2, Lamb Dep. Tr. 15:19–22.]

For this reason, the inference that either Defendant was aware of the state of the commissary ceiling by virtue of his job responsibilities or likely contacts with other Defendants is too weak to preclude summary judgment against either Defendant. Plaintiff must, therefore, rely on the offender requests he sent each Defendant. The problem for Plaintiff, however, is that both Defendants independently testified that the offender requests in the record are missing critical indicia of receipt by the Office of the Warden.

According to Lemke, "[a]ny correspondence that comes in" to the Warden's office "gets stamped" and "says received by the warden's office" along with a date. [181-10, Lemke Dep. Tr. 49:5–23.] Defendant Williams similarly remarked that Plaintiff's offender request is "very plain, like it's never been processed." [181-11, Williams Dep. Tr. 75:6–7.] According to him, if the request had actually been received by the Warden's office "there would be some type of markings on there," including "documentation or timestamps." [*Id.* at 76:2–3.] Based on the absence of these marks, Defendant Lemke found it highly unlikely Plaintiff's "request was actually sent in." [181-10, Lemke Dep. Tr. 19:18–20.] Defendant Lemke further testified that even if his office had received it, it was "very unlikely that [he] actually saw it" because it was "just an ordinary everyday request." [*Id.* at 19:24–20:7.] As Warden, Defendant Lemke expected his assistants to forward such routine requests on to the Chief Engineer. [*Id.* at 20:9–21:5.]

Plaintiff bears the "the burden of demonstrating that [each of these] communication[s], in its content and manner of transmission, gave [Defendants Lemke and Williams] sufficient notice to alert him . . . to 'an excessive risk to inmate health or safety." *Vance*, 97 F.3d at 993 (internal quotation marks omitted). Defendants have proffered substantial evidence casting doubt on the likelihood that each of Plaintiff's offender requests were received, much less read, by either Defendant. This finding, coupled with the absence of any other evidence suggesting that either Defendant closely interacted with the commissary or exchanged information about the issues reported by Plaintiff, renders summary judgment appropriate with respect to both.[6]

---

[6] Although it is true that Defendant Lamb, who was warned about the ceiling by Plaintiff's emergency grievance, did routinely send Defendant Williams Safety & Sanitation Memoranda discussing maintenance issues in the commissary, none of these reports speak to falling wood or debris. For the reasons expressed earlier in this opinion, the inference that deterioration in the ceiling tiles suggests similar deterioration in the support beams is not strong enough to permit an inference of subjective knowledge on the basis of these reports alone.

All told, the Court finds that there is sufficient evidence in the record to create a genuine issue of material fact concerning the deliberate indifference of Defendants Lamb, Wright, Johnson, and Louch. A rational jury could find that each Defendant learned of the danger posed by the commissary ceiling to inmate safety—whether through a direct communication from Plaintiff or an interaction with other Defendants possessing such knowledge—and failed to take the necessary measures to protect Plaintiff from potential harm. Plaintiff's injury alone is evidence that the commissary was not adequately repaired. Furthermore, steps short of repairing the roof were available to protect inmates, including, as Plaintiff suggested in several of his offender requests, moving the commissary to a safer portion of the prison.

Defendants argue that it would be "unfair" to hold Defendants Johnson and Wright responsible for an accident that occurred after each left Stateville. They cite to *Smith v. Cooper*, 1998 WL 142426 (N.D. Ill. Mar. 25, 1998), for the proposition that a prison official's pre-accident departure requires a court to enter summary judgment in his favor in a deliberate indifference case. But in *Smith*, the relevant defendant retired *before* the challenged condition (missing windows that exposed the plaintiff to bone-chilling cold) was first created. *Id.* at *2 ("I find that Cartwright stopped working at JCC before the date when the *conditions Smith complains about began*."). *Smith*, thus, stands for the proposition that a Defendant cannot be held personally liable for a condition that he *never could have addressed*, not the proposition that a Defendant can avoid liability for a dangerous condition he failed to address by leaving the prison before it causes injury.

Defendants further argue that none of the IDOC Defendants were "actually responsible for performing . . . repair work" on the commissary "themselves" and that Plaintiff has failed to prove that each is "individually responsible for the maintenance in question." [187, p. 7.] To the extent Defendants' argument challenges causation, there is sufficient evidence in the record that each of

44

the remaining Defendants, by virtue of their job responsibilities, could have taken measures to protect inmates using the commissary. It is ultimately up to a jury to decide not only whether each Defendant failed to do so with deliberate indifference to Plaintiff's safety, but also to assess causation and relative fault.

### 2. *Official Capacity Claims*

Plaintiff also sues Defendants Lemke, Williams, and Lamb in their official capacities. [58, ¶ 54–55.] He alleges that, as final policymakers for the Illinois Department of Corrections, they "maintain[ed] a widespread policy, practice, or custom at Stateville . . . of" (1) "refusing to ensure the provision of adequate maintenance and repairs . . . in order to save money" and (2) "inadequately investigating and responding to inmate complaints regarding dangerous conditions in the facility." [*Id.*] So far as the Court can tell, Defendants made no effort to contest these claims in their motion for summary judgment. Because the parties' Rule 56.1 statements and briefs do not address the potential nuances of these claims or point to facts in the record that might be relevant to them, the Court is not prepared to enter summary judgment on them *sua sponte*. Furthermore, because Defendants Lemke, Williams, and Lamb have all retired from their positions at Stateville, the Court will substitute them with the current Warden and Assistant Warden of Operations at Stateville. See Fed. R. Civ. P. 25(d) (providing that when "a public officer who is a party in an official capacity . . . ceases to hold office while [an] action is pending," "[t]he officer's successor is automatically substituted as a party.").

### 3. *Negligence Claim*

In addition to suing the IDOC Defendants for deliberate indifference, Plaintiff's Second Amended Complaint also includes a negligence claim against all six Defendants under the common law of Illinois. [58, ¶¶ 85–88.] Defendants' motion for summary judgment does not

contest this claim, either. As with Plaintiff's official-capacity claims, the Court will not enter summary judgment on Plaintiff's negligence claim *sua sponte*.

## IV.    Conclusion

For the foregoing reasons, the Court grants the Wexford Defendants' motion [165] in full and the IDOC Defendants' motion [168] in part. With respect to that motion, the Court will enter summary judgment on the individual-capacity claims against Defendants Williams and Lemke. The Court denies the remainder of the IDOC motion in full. The Court further orders, with respect to Plaintiff's official capacity claims against Defendants Lemke, Williams, and Lamb, that the current Warden and Assistant Warden of Operations of Stateville be substituted under Fed. R. Civ. P. 25(d). This case is set for a telephone status hearing on October 17, 2022, at 9:30 a.m. Participants should use the Court's toll-free, call-in number 877-336-1829, passcode 6963747.

Dated:  September 30, 2022

Robert M. Dow, Jr.
United States District Judge